**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 15-1801 and 15-2380

_____

ISRAEL BORNSTEIN, as Administrator of the
Estate of Amit Bornstein and individually,
Appellant

v.

MONMOUTH COUNTY SHERIFF'S OFFICE;
SGT. KENNETH NOLAND; OFC. TRACEY TIFT;
OFC. THOMAS RICCHIUTI; OFC. TIMOTHY HUDDY;
OFC. DANIEL HANSSSON; OFC. RAYMOND PAUL;
OFC. RICK LOMBARDO; OFC. STEVEN YOUNG;
OFC. GEORGE THEIS; OFC. DONALD BENNETT;
OFC. CHRISTOPHER PINEY;
CORRECT CARE SOLUTIONS LLC

*(Amended per Clerk's order dated 6/23/2015)

_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.:  3-11-cv-05336)
District Judge:  Honorable Anne E. Thompson

_____

Argued on April 7, 2016

Before:  FISHER, COWEN and RENDELL, <u>Circuit Judges</u>

(Opinion filed:  August 5, 2016)

Michael N. David
82 Wall Street
Suite 610
New York, NY  10005

Kenneth J. Gorman **(Argued)**
225 Broadway
Suite 307
New York, NY  10007

     Counsel of Appellant Israel Bornstein


Andrew Bayer **(Argued)**
Gluck Walrath
428 River View Plaza
2nd Floor
Trenton, NJ  08611

     Counsel for Appellee Monmouth County Sheriffs Office


Scott C. Bushelli
Stahl & DeLaurentis
10 East Clements Bridge Road
Runnemede, NJ  08002

Katherine H. Solomon **(Argued)**
Caryn J. Lilling
Mauro, Lilling, Naparty
100 Crossways Park Drive
Suite 310
Woodbury, NY  11797

     Counsel for Appellee Correct Care Solutions, LLC

**RENDELL**, Circuit Judge:

This case arose from the tragic death of Amit Bornstein ("Amit"), a young man who died in the Monmouth County Correctional Institution ("MCCI"). Israel Bornstein ("Bornstein"), his father and the administrator of his estate, sued the Monmouth County Sheriff's Office ("MCSO"), several of its officers, and Correct Care Solutions LLC ("CCS"), a private corporation that provided medical staff to treat MCCI prisoners. He asserted excessive force claims under 42 U.S.C. § 1983 against MCSO and its officers and medical malpractice claims against CCS. At the end of a jury trial, the District Court granted a directed verdict to CCS on the claims against it. The § 1983 claims against MCSO and its officers went to the jury, which returned a verdict in their favor. On appeal, Bornstein contests numerous rulings by the District Court. For the reasons that follow, we will affirm each one.

## I. Background

Because we write primarily for the parties, who are familiar with the facts and procedural history of this case, we recite only a brief summary here.

On July 29, 2010, Amit landed in MCCI after he was arrested at his home by two MCSO officers serving him with arrest warrants. Before hauling him to MCCI, they

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

discovered that Amit's thirteen-year-old brother Elad was the only other person in the home. The officers enlisted the help of a neighbor, who took Elad to her home. The officers then brought Amit to MCCI, where he began the intake process in the booking nurse's station.

During this process, an MCSO officer took Amit's cell phone out of the evidence locker and asked Amit to show him where he could find the phone number for Amit's father. The officer wanted to give the number to New Jersey's Division of Youth and Family Services so that the agency could find someone to take care of Elad. During this conversation, Amit asked to use his phone to call Elad, but the officer refused. This angered Amit, and so he swore at the officer, who then ordered Amit to go to a holding cell. Amit ignored the officer and instead went back to the booking nurse's station. The officer then approached him and instructed him to go to the holding cell. Amit refused. Several other MCSO officers arrived to help escort Amit to the holding cell. They forced him into the hallway, at which point he spun around and confronted them.

This situation turned ugly fast. The officers managed to wrestle Amit to the ground, and several more MCSO officers then converged on the scene. As the officers struggled to restrain Amit, one officer sprayed him in the face with a burst of pepper spray. At trial, some of the officers testified that the spray did not faze Amit and also that he seemed abnormally strong and resistant to their attempts to subdue him.

Once they finally gained control of Amit and got him cuffed and on his feet, they took him back to the booking nurse's station. While there, he yelled at them and a CCS nurse that he was having trouble breathing. Soon thereafter, they placed him in a

4

wheelchair and fastened a spit mask to his face, apparently because he was spitting blood at them.

The officers wheeled Bornstein to the upstairs medical section of MCCI so that he could be evaluated by a CCS nurse and CCS social worker. He told the nurse that he was struggling to breathe with the spit mask on. After an officer removed the mask, the nurse cleaned his face with saline solution but did not take his vitals because he was too aggressive. She also called the doctor, who told her to give Amit a shot of Ativan (a sedative), which she did. An officer then put the spit mask back on him, and the social worker ordered him to be taken to a constant watch cell.

Amit did not settle quietly into this cell. After the officers rolled him there in the wheelchair, they ordered him to remove his clothes so that they could dress him in a suicide smock. He resisted. At that point, several officers converged on him. Once they gained control of him, they removed his clothes and strapped him to a restraint chair.

The officers then left Amit in the constant watch cell, where he was observed by a CCS nurse and an MCSO officer. The nurse first checked on him at 6:06 p.m. but claimed she was unable to take his vitals due to his aggression. She then observed him at 6:20 p.m. and 6:35 p.m. At about 6:40 p.m., she entered the cell, accompanied by several officers, and discovered that his vital signs were weak. They removed him from the restraint chair and gave him CPR until the paramedics arrived and took him to the hospital, where he was pronounced dead soon after arriving.

In September 2011, Bornstein sued MCSO and multiple MCSO officers. He asserted, via § 1983, claims of excessive force, unlawful custom/policy/training, and

5

supervisory liability, as well as a wrongful death claim. Soon thereafter, he amended his complaint, adding CCS as a defendant (but none of its individual employees) and asserting against it medical malpractice claims and a survival action.

The case went to trial. After nine days and thirty-three witnesses, the District Court granted CCS's motion for a directed verdict on all counts against it. The § 1983 claims went to the jury, which returned a verdict for MCSO and its officers on all counts.

## II. Discussion

Bornstein contests six rulings by the District Court.[1]

### A. Steroid Evidence

First, Bornstein challenges the District Court's decision to deny his Rule 403 motion seeking to preclude the defendants from introducing evidence at trial that Amit was a steroid user. "We review the District Court's Rule 403 ruling for an abuse of discretion," *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010), and find no abuse of discretion in its ruling that the probative value of this evidence was not substantially outweighed by a danger of unfair prejudice, *see* Fed. R. Evid. 403.

The defendants wanted to establish through expert testimony at trial that Amit abused steroids and that this abuse caused him to develop severe heart problems. This evidence was relevant because the defendants and Bornstein held competing theories as

---

[1] We need not address the seventh ruling that he challenges, which pertains to the District Court's barring of his survival claim. Given our affirmance of the following six rulings, he lacks any substantive claims to pursue, and so any error by the District Court as to the survival claim was harmless. *See Aronberg v. Tolbert*, 25 A.3d 1121, 1124 (N.J. 2011) ("The Survivor's Act, N.J.S.A. 2A:15–3, permits, for the benefit of the decedent's estate, an appointed representative to file any personal cause of action that decedent could have brought had he lived.").

to what caused Amit's death. The defendants' theory was that Amit died from a cardiac event that was caused by his steroid abuse; Bornstein's theory was that Amit died from asphyxia that was caused by excessive force and the use of the spit mask.

The defendants became aware of Amit's possible steroid abuse from the results of his autopsy that was performed by Dr. Frederick DiCarlo, the medical examiner. Dr. DiCarlo discovered that Amit, who was only twenty-two years old when he died, suffered from severe cardiac conditions such as an enlarged heart and narrow arteries. Critically, he also learned that Amit had been taking a drug called tamoxifen.

The defendants sought to introduce at trial expert testimony that tamoxifen, though typically taken by women to prevent and treat breast cancer, is also taken by steroid users to mitigate the breast growth that can result from steroid abuse. Although Amit did not have any steroids in his system when he died, the defendants wanted to establish his steroid abuse by offering expert testimony that steroid users often take cycles of tamoxifen in between cycles of steroids. They also wanted to offer expert testimony that steroid abuse can wreak havoc on the heart and cause problems like those seen in Amit.

Relying on Rule 403, Bornstein argued that the District Court should preclude the defendants from introducing evidence that Amit abused steroids. He offered to stipulate to Dr. DiCarlo's findings on Amit's heart problems, claiming this would allow the defendants to prove the same point—that Amit suffered from heart problems—but in a less prejudicial way because the jury would not judge Amit for his steroid use. The District Court disagreed, concluding this evidence was "part of the picture." App. 2726.

7

At trial, the defendants thus presented extensive expert testimony on this issue. For example, several doctors, including Dr. DiCarlo, testified that steroid use was the only reason that a young, healthy man like Amit would test positive for tamoxifen. They also testified as to the adverse impact that steroid abuse can have on a person's heart.

On appeal, Bornstein argues that the District Court erred in allowing this testimony, stressing how he had conceded that Amit suffered from heart problems and had agreed not to dispute Dr. DiCarlo's findings on that point. He contends that the steroid evidence thus lacked "any probative value" because "the issue of [Amit's] heart condition was not in dispute." Bornstein Reply Br. 3. As a result, he argues, the District Court abused its discretion in holding that the probative value of the steroid evidence was not substantially outweighed by the unfair prejudice that would inevitably result from Amit's being viewed by the jury as an illegal drug user.

We disagree. As the District Court reasonably concluded, the probative value of the steroid evidence derived from its contribution to the overall "picture" of how Amit might have died. *See* App. 2725–26. Even though Bornstein stipulated that Amit suffered from heart problems, the steroid evidence helped to explain to the jury why Amit, a seemingly healthy young man, had developed these issues at such an early age. *See Old Chief v. United States*, 519 U.S. 172, 187–89 (1997) (explaining the value of contextual evidence and the problems that arise when a party is permitted to substitute a bare stipulation for a full picture of the events relied upon). We thus discern no abuse of discretion in the District Court's ruling that the probative value of this evidence was not substantially outweighed by a danger of unfair prejudice. *See Acumed LLC v. Advanced*

8

*Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (stating that a district court abuses its discretion only when its decision was "arbitrary, fanciful or clearly unreasonable").

### B.  Deliberate Indifference Claim Against MCSO Officers

Second, Bornstein argues that the District Court erred when it refused to charge the jury on a § 1983 deliberate indifference claim against the MCSO officers. "[W]e review the district court's refusal to give jury instructions on an abuse of discretion basis," *Gov't of Virgin Islands v. Isaac*, 50 F.3d 1175, 1180 (3d Cir. 1995), and conclude that it did not abuse its discretion in finding that Bornstein had presented insufficient evidence for the jury to be charged on this claim.

Just before the case went to the jury, Bornstein asked the District Court to charge the jury on this claim. He had never pleaded the claim in his complaint, but the District Court indicated that it was still part of the case because he had alleged it in the final pretrial order. It nevertheless refused to charge the jury on the claim, citing a lack of evidence to support it. Bornstein contends that the District Court abused its discretion because he did in fact present enough evidence for the jury to be charged on this claim.

We disagree. In support of his argument, Bornstein mostly points to evidence suggesting that the MCSO officers violated MCCI policies. But the issue is not whether they violated internal prison policies but whether they violated the Constitution. *See Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992). To prevail on this constitutional claim, Bornstein had to prove at trial (1) that Amit suffered from a "serious medical need[]"; and (2) that at least one of the MCSO officers "recklessly disregard[ed] a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).

9

That meant he had to show that at least one of the MCSO officers "intentionally den[ied] or delay[ed] [Amit's] access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). As the District Court highlighted, however, Bornstein did not proffer sufficient evidence to make this showing. To the contrary, the evidence showed that, in the short time that Amit spent at MCCI, the MCSO officers ensured that he was seen and treated by medical personnel on multiple occasions. We therefore conclude that the District Court did not abuse its discretion in refusing to charge the jury on this claim.

### C. Testimony of Dr. Michael Baden

Third, Bornstein argues that the District Court erred in precluding his expert, Dr. Michael Baden, from testifying that the CCS medical personnel breached their standard of care. We reject Bornstein's argument because the District Court did not unequivocally preclude him from eliciting this testimony from Dr. Baden. Rather, as Bornstein admitted to the District Court, he made a strategic decision not to try to do so.

At trial, Bornstein's counsel informed the District Court that Dr. Baden would be testifying primarily as to what caused Amit's death, but he also suggested that Dr. Baden would be testifying that the CCS medical personnel breached their standard of care. Although the District Court, in response, told Bornstein to focus Dr. Baden's testimony on what caused Amit's death, it also left the door open for him to try to elicit testimony from Dr. Baden on the standard of care issue. *See* App. 2788 ("[Dr. Baden] can tell us with regard to his opinions on cause of death. I think that was what was decided upon in the pre-trial order. And that's where I'm going to focus. . . . If a controversy arises, there's some opinion that you feel is relevant here and you have some question about,

10

let's go to side bar in advance. All right."). But counsel never did, and he later informed the District Court that he had made a strategic decision to offer Dr. Baden as an expert to testify *only* as to what caused Amit's death—and not as to whether the CCS medical personnel breached their standard of care. *See* App. 2965, 2970. As a result, he cannot now assert that the District Court abused its discretion by precluding Dr. Baden from testifying against CCS on this issue. *See Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992) ("When a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake . . . .").

## D. Medical Malpractice Claims Against CCS

Fourth, Bornstein argues that the District Court erred by granting CCS a directed verdict on his medical malpractice claims against it. The District Court did so because Bornstein had failed to produce an expert witness to establish the applicable standard of care. Bornstein challenges the District Court's ruling that these claims could not still proceed based on the "common knowledge" exception to the requirement that a plaintiff asserting medical malpractice claims must establish the applicable standard of care via expert testimony. "We exercise plenary review of an order granting . . . a motion for judgment as a matter of law and apply the same standard as the district court," *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). We agree with the District Court's ruling that the common knowledge exception did not apply in this case.

To succeed on a medical malpractice claim, a plaintiff must prove, among other things, that the defendant breached the applicable standard of care. *Verdicchio v. Ricca*,

11

843 A.2d 1042, 1055–56 (N.J. 2004). In the typical case, the plaintiff must establish that standard through expert testimony because "a jury generally lacks the requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert." *Rosenberg by Rosenberg v. Cahill*, 492 A.2d 371, 374 (N.J. 1985) (internal quotation marks omitted).

But "[t]he doctrine of common knowledge permits exception to the general rule; when it is applied, expert testimony is not needed to establish the applicable standard of care." *Estate of Chin v. St. Barnabas Med. Ctr.*, 734 A.2d 778, 785 (N.J. 1999). This exception applies only when the defendant's negligence is obvious "to anyone of average intelligence and ordinary experience." *Id.* at 785–86 (citation omitted); *see, e.g.*, *Hubbard ex rel. Hubbard v. Reed*, 774 A.2d 495, 500–01 (N.J. 2001) ("It has long been settled that pulling the wrong tooth is negligent as a matter of common knowledge."). In that case, "the jury itself is allowed to supply the applicable standard of care." *Rosenberg*, 492 A.2d at 374 (internal quotations omitted). "[I]t is the unusual professional malpractice case in which the common knowledge doctrine can be invoked." *Id.*

The District Court held that the doctrine was inapplicable to this case. According to the District Court, without an expert, the jury would be left to speculate as to the propriety of the nurses' actions, actions they took while treating an aggressive man in a correctional facility—a unique setting. The District Court stated that the jury would lack an informed benchmark against which to consider, for example, whether the nurses appropriately checked on Amit every fifteen minutes (as opposed to every ten or five) when he was in the constant watch cell, or whether they reasonably declined to check his

12

vitals at certain times because he acted aggressively toward them. We find no error in this reasoning.

### E. Testimony of Martin Horn

Fifth, Bornstein contends that the District Court erred by precluding his other expert, Martin Horn, from testifying that CCS breached the standard of care. Horn, a former commissioner of the Departments of Probation and Correction in New York City, was offered mainly as an excessive force expert to testify against the MCSO defendants. But in his expert report he also suggested that CCS medical personnel breached their standard of care. In response to CCS's motion to preclude this testimony, the District Court barred Horn from offering any standard of care opinions as to CCS, finding that he was unqualified to do so. We discern no abuse of discretion in this ruling, as nothing in the background of Horn, who was neither a doctor nor a healthcare professional, suggested that he was qualified to offer this type of specialized opinion. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993) (explaining that under Fed. R. Evid. 702 a district court can exclude an expert "if the particular expert does not have sufficient specialized knowledge to assist the jurors").

### F. Deliberate Indifference Claim Against CCS

Lastly, Bornstein argues that the District Court erred by barring him from asserting a § 1983 deliberate indifference claim against CCS. Although he never pleaded this claim in his complaint, he argued that it was nonetheless part of the case because he had asserted it in the final pretrial order ("FPO"). The District Court, in effect, rejected

13

this argument because it concluded that CCS would have suffered severe prejudice had Bornstein been permitted to pursue this claim at trial. We agree.

Bornstein never alleged any § 1983 claims against CCS in his complaint; he alleged only medical malpractice claims. He clearly wanted the § 1983 claims in his case against CCS, though, but rather than request to amend his complaint, he repeatedly argued that he had actually pleaded these claims in his complaint. The District Court disagreed, stating not once but twice that "it is clear that Plaintiff's claims against Defendant CCS are for medical malpractice. The Court finds nothing in the Amended Complaint to indicate that Plaintiff raised any § 1983 claims against Defendant CCS." App. 17.3; *see also* App. 35–36.

Bornstein then included in the FPO, filed five weeks before trial, a § 1983 deliberate indifference claim against CCS. *See* App. 904 ( "Whether defendant CCS acted with reckless disregard to [Amit's] medical needs in violation of the Eighth and Fourteenth Amendments of the Constitution and 42 USC section 1983.").

Four days later, CCS moved in limine for an order finding that it was not a state actor under § 1983. In response, Bornstein cross-moved to amend his complaint to allege that CCS was a state actor and that it was deliberately indifferent to Amit's serious medical need. On February 9, 2015, shortly before trial was scheduled to begin, the Magistrate Judge denied Bornstein's motion to amend his complaint to add this claim.

Shortly after the trial started, though, Bornstein argued to the District Court that the claim was part of the case because he had asserted it in the FPO, which supersedes the pleadings. And on February 25, the fifth day of trial, the District Court suggested—at

14

least initially—that it agreed that this claim was "in the case with regard to CCS" because Bornstein had asserted it in the FPO. App. 2728. The District Court informed the parties that it had done "further research and [was] satisfied that when an issue is set forth in the [FPO] it is not necessary to amend previously filed pleadings because the [FPO] is the controlling document for the trial." *Id.* But CCS objected, arguing that the claim could not be in the case because the Magistrate Judge had denied Bornstein's motion to amend his complaint to add the claim and that it would suffer undue prejudice if it now had to defend against this claim. The District Court wavered and then concluded, "We're going to have to keep this in abeyance and devote more time to it later on. We'll have to leave it as unresolved at this point." App. 2729. Yet it never seemed to resolve this issue.

Nevertheless, we will consider the District Court's failure to rule on this issue as an implicit denial of Bornstein's argument that the claim was part of the case because it was in the FPO. Although the District Court never explicitly ruled on this issue, it later granted CCS's Rule 50(b) motion on all of Bornstein's claim against it. *See Tollett v. City of Kemah*, 285 F.3d 357, 369 n.1 (5th Cir. 2002) ("Although the district court . . . did not explicitly deny that motion, the entry of its 'FINAL JUDGMENT' was an implicit denial of any outstanding motions . . . ."); *cf. United States v. Claxton*, 766 F.3d 280, 290 (3d Cir. 2014) ("In light of the unique procedural posture of this case, we will exercise our discretion and consider the merits of Claxton's appeal by treating the District Court's failure to issue an explicit ruling as an implicit denial of his Rule 33 motion.").

In addition, even though the District Court only implicitly denied this argument, it explicitly explained its reasons for doing so in a post-trial opinion. After trial, Bornstein

15

appealed the Magistrate Judge's ruling that he could not amend his complaint to add the deliberate indifference claim against CCS. He argued that the Magistrate Judge erred because, regardless of any prejudice to CCS, the claim was part of the case because he had included it in the FPO, which controls the course of the trial and supersedes all prior pleadings. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("[W]here a claim was not included in the complaint, but was included in the pretrial order, 'it is irrelevant that the pleadings were never formally amended.'" (citation omitted)). The District Court acknowledged this general rule but asserted that "courts have not blindly or automatically applied [it]." App. 62. Rather, the District Court stated, "courts have carefully assessed the prejudice to the opposing party and, where prejudice exists, the newly asserted claim or defense has been rejected despite its inclusion in the [FPO]." *Id.* (citing *Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1045 n.10 (D.N.J. 1993); *In re AT&T Sec. Litig.*, No. 00-5364 (GEB), 2004 WL 6392120, at *5–7 (D.N.J. Apr. 6, 2004)). It then held that CCS would have been unfairly prejudiced by the late addition of this claim, emphasizing that Bornstein "sought to add at the eleventh hour not merely a new type of remedy or new facts to support a previously asserted theory of liability but rather an entirely new cause of action raising a new theory of liability, just weeks before trial was set to begin." App. 63. To defend against this claim, according to the District Court, CCS would have had to "rush to take additional expert and witness depositions relating to the new claim and formulate its new defense strategy." App. 64.

We see no error in the District Court's decision to exclude this claim. After all, "[i]t is well established that departure from or adherence to the pretrial order is a matter

16

peculiarly within the discretion of the trial judge," and that the decision to exclude a claim that was stated in the FPO "will not be disturbed absent a clear abuse of discretion." *Beissel v. Pittsburgh & Lake Erie Ry. Co.*, 801 F.2d 143, 150 (3d Cir. 1986).

### III. Conclusion

For the forgoing reasons, we will affirm the District Court in all respects.