**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA, ex
rel. ALI BAHRANI,

     Plaintiff-Appellant and Cross-
     Appellee,

v.

CONAGRA, INC.; CONAGRA HIDE
DIVISION; CONAGRA BEEF
COMPANIES; MONFORT, INC.,

     Defendants-Appellees and
     Cross-Appellants.

_____

UNITED STATES OF AMERICA,

     Amicus Curiae.

Nos. 09-1163; 09-1180; & 09-1388

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:00-CV-01077-JLK-KLM)**

---

George Bryan Ulmer, III, (Larissa A. McCalla with him on the briefs), of The
Spence Law Firm, LLC, Jackson, Wyoming, for Plaintiff-Appellant and Cross-
Appellee.

Patricia C. Campbell, (Darrell G. Waas with her on the briefs), of Waas Campbell
Rivera LLP, Denver, Colorado, for Defendants-Appellees and Cross-Appellants.

Michael D. Granston, Attorney, Department of Justice, Washington, D.C., (Tony
West, Assistant Attorney General; David M. Gaouette, United States Attorney;

Douglas N. Letter and Nicholas Bagley, Attorneys, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., with him on the brief), for Amicus Curiae.

Before **BRISCOE,** Chief Judge, **BALDOCK,** and **TYMKOVICH**, Circuit Judges.

**BRISCOE**, Chief Judge.

Plaintiff Ali Bahrani filed this action under the reverse false claims provision of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(7), alleging that defendants ConAgra, Inc., ConAgra Hide Division, ConAgra Beef Company, and Monfort, Inc. (collectively ConAgra or defendants) altered thousands of beef and hide export certificates issued by the United States Department of Agriculture (USDA), rather than obtaining replacement certificates, in order to avoid paying the fees charged by the USDA for replacement certificates. The district court initially granted summary judgment in favor of defendants, but this court, in U.S. ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189 (10th Cir. 2006) (Bahrani I), reversed and remanded for further proceedings. On remand, a jury found that Bahrani was not an "original source" for his meat export certificate claims. A separate jury found in Bahrani's favor on only five of the hide export certificates at issue and awarded him actual damages of $107.50. The district court subsequently trebled the actual damages and imposed statutory penalties of

2

$5,500 per claim, as required by the FCA, resulting in a total judgment of $27,822.50 in favor of Bahrani. Following the entry of judgment, Bahrani moved for an award of attorney fees, expenses and costs in the amount of $3,449,469.10. The district court, pursuant to a magistrate judge's recommendation, awarded Bahrani $9,274.16 in fees, expenses and costs.

Bahrani now appeals (No. 09-1163) from the judgment entered by the district court, asserting the district court committed a host of errors in resolving his meat and hide export certificate claims. Defendants have filed a cross-appeal (No. 09-1180) alleging three errors relating to the resolution of Bahrani's hide export certificate claims. Bahrani has also filed a second appeal (No. 09-1388) challenging the district court's ruling on his motion for attorney fees, expenses and costs.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the portion of the district court's judgment pertaining to Bahrani's meat export certificate claims, but reverse the portion of the judgment pertaining to Bahrani's hide export certificate claims and remand with directions to enter judgment in favor of ConAgra on those claims. We also reverse the award of attorney fees, expenses and costs in favor of Bahrani and dismiss Bahrani's appeal of the fee, expense and cost award as moot.

I

The underlying facts of this case were set forth in considerable detail in

Bahrani I.  Accordingly, we will revisit only the background information

necessary to an understanding of the instant appeals.

*USDA export certificates*

In Bahrani I, we explained how USDA export certificates are utilized by

companies, such as ConAgra, that export animal products:

> To facilitate and promote foreign trade and to protect the food supply, the USDA provides certificates to companies that export animal products.  These export certificates are part of a comprehensive scheme administered by the Food Safety and Inspection Service . . . , which regulates meat exports, and the Animal Plant Health Inspection Safety Service [APHIS] . . . , which regulates hide exports.  The regulations are authorized by the Federal Meat Inspection Act, 21 U.S.C. §§ 601-695, the Poultry Products Inspection Act, 21 U.S.C. §§ 451-471, and the Agricultural Marketing Act, 7 U.S.C. §§ 1621-27.

> Under the Food Inspection Service regulations, exporters are required to obtain certificates from USDA inspectors for each shipment.  Each certificate has a unique serial number and states the shipment's destination, the exporter, the consignee, and the number and kinds of products it contains.  9 C.F.R. § 322.2.  The destination may affect the content of the certificates: some countries require more information than the Food Inspection Service does, and, in those instances, the USDA provides exporters with certificates that comply with those other countries' requirements.

> The [APHIS] regulations contain a similar provision addressing certificates for exports of animal hides.  9 C.F.R. § 156.3.  In contrast to the Food Inspection Service regulations, the [APHIS] regulations do not require a certificate for every shipment.  However, some foreign countries do require certificates, and the [APHIS] regulations provide that exporters shipping hides to those countries may obtain a certificate from an inspector.

> The Food Inspection Service and the [APHIS] both charge fees for the certificates.  The Food Inspection Service's export certificate

fee is based upon the time expended by its inspectors for providing information over and above the minimum certification requirements set forth by federal law. See 9 C.F.R. §§ 307.4—307.6, 322.2, 391.1—391.3. In contrast, the [APHIS] charges a flat fee . . . [t]he purpose of [which] is to reimburse the government for the costs incurred.

Occasionally, an exporter may discover inaccuracies in an export certificate after it has been issued by a USDA inspector. There may be typographical errors or more substantive deficiencies involving matters such as the grade of beef or the destination of the product. In those instances, the inspectors' practice has been to make corrections on the original certificate themselves, authorize those corrections to be made by the exporters, or to issue a new certificate. * * * Although there is not a[n] [APHIS regulatory] provision addressing the payment of fees for these "in lieu of" and replacement certificates, the parties do not dispute that the regulations authorize the . . . [APHIS] to charge fees for them.

The regulations do not set forth a standard for determining when these "in lieu of" and replacement certificates are required.

465 F.3d at 1192-93.

*ConAgra's export operations/Bahrani's employment with ConAgra*

Defendants are engaged in the business of exporting meat and animal products, including beef hides. Bahrani began working for ConAgra in 1996 as "a documentation coordinator/international negotiator" at ConAgra's Greeley, Colorado office. Aplt. App. at 410-11. In that role, Bahrani "worked with all documents pertaining to the exports of raw hides, bills of lading, export certificates, insurance forms, slaughter date certificates, [and] weight sheets." Id. at 411. Most of Bahrani's work involved shipments of hides to Korea, some to Japan and Taiwan, and a few to Thailand. Later in his employment with

5

ConAgra, Bahrani also worked on shipments to Canada and Mexico.

Bahrani allegedly knew several people that worked in ConAgra's meat documentation division, which was physically housed in the same building and on the same floor as the hide documentation division. According to Bahrani, he also, on occasion, visited the meat documentation division, either to speak with friends or to use that division's photocopying equipment.

Bahrani was terminated from his employment with ConAgra on April 7, 1998, as part of a reduction in force. On that same date, Bahrani spoke with an FBI agent and informed him "that Con[A]gra was altering government documents and that [he] needed to get immunity from prosecution for [him]self and for [his] co-workers." Id. at 449-50. The FBI subsequently turned that information over to USDA investigators.

*Procedural background*

Bahrani filed this action on May 25, 2000, alleging that defendants violated the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(7), by routinely altering both meat and hide export certificates without obtaining replacement or "in lieu of" certificates and, in turn, without paying the fee for such replacement or "in lieu of" certificates to the government. The district court granted summary judgment in favor of defendants, concluding that: (a) the statutes and regulations invoked by Bahrani did not establish that defendants were obligated to obtain and pay for "in lieu of" or replacement certificates every time a change was required;

6

(b) even if the regulations required ConAgra to obtain new certificates when it discovered errors and omissions, the act of altering a certificate was not an actionable reverse false claim because the obligation to obtain an "in lieu of" or replacement certificate arose only as a result of the alteration and did not exist before; and (c) the fact that USDA inspectors could exercise their discretion and permit defendants to forego obtaining "in lieu of" or replacement certificates indicated that ConAgra's "obligation" was a contingent one, and thus not covered by § 3729(a)(7).

Bahrani appealed from the entry of summary judgment. This court, in Bahrani I, reversed the grant of summary judgment in favor of defendants and remanded for further proceedings. In doing so, this court concluded: (a) although USDA officials possessed some discretion to waive the necessity of a replacement or "in lieu of" certificate, that did not "take[] the obligation to pay the fees outside the scope of § 3729(a)(7)," 465 F.3d at 1204; (b) the evidence presented by both parties "indicate[d] that when export certificates required 'significant' or 'major' changes, the USDA required exporters to obtain 'in lieu of' or replacement certificates, id.; (c) "[t]he fact that a government official may subsequently waive an established fee does not negate the 'potential effect' of a false record or statement," id.; and (d) that Bahrani presented sufficient evidence to allow a reasonable jury to find he was an "original source" for his meat export certificate claims. Id. at 1209.

7

On remand, the district court bifurcated the proceedings on Bahrani's meat export certificate and hide export certificate claims. In April of 2008, a trial commenced on the issue of whether Bahrani qualified as an "original source" for his meat export certificate claims (the "jurisdictional trial").[1] At the conclusion of the evidence, the jury found that Bahrani was not an "original source" for any of the 9,328 meat export certificate claims at issue.

The second phase of the case, which was then limited to Bahrani's hide export certificate claims, was tried to a jury beginning in March of 2009. After less than a day of deliberations, the jury returned a verdict finding that, of the approximately 1057 hide export certificates proffered by Bahrani as reverse false claims under 31 U.S.C. § 3729(a)(7), five had been changed in a "major" or "significant" way, and all five had been changed under circumstances where the employee who made the changes did so "knowing" that, rather than making the changes directly to the certificate, he or she was required to secure and pay the government for a replacement certificate. The jury found that the government sustained actual damages of $107.50 (i.e., five times a $21.50 fee per certificate). The district court subsequently trebled the actual damages and imposed statutory

---

[1] We refer to this initial trial as the "jurisdictional trial" because the FCA's "original source" requirement, which we explain in greater detail below, is jurisdictional in nature. See In re Natural Gas Royalties, 562 F.3d 1032, 1043 (10th Cir. 2009) ("Because the public disclosure bar has been triggered, all the instant cases will be barred for lack of subject matter jurisdiction unless Relator can demonstrate original source status.").

penalties of $5,500 per claim, as required by the FCA, resulting in a total judgment of $27,822.50 in favor of Bahrani.

Bahrani filed a motion to alter or amend judgment seeking attorney fees pursuant to the FCA. The district court denied that motion without prejudice and directed Bahrani to file a formal motion for fees. As directed, Bahrani filed a timely motion pursuant to Federal Rule of Civil Procedure 54(d)(2) and 31 U.S.C. § 3730(d)(2) for an award of expenses, attorney fees and costs in the amount of $3,449,469.10. Defendants objected to Bahrani's motion and filed a cross motion for expenses, attorney fees and costs related only to the meat export certificates portion of the case in the amount of $1,211,113.97. The district court referred the motions to a magistrate judge for a report and recommendation. The magistrate judge recommended that Bahrani's motion be granted in part and that, pursuant to 31 U.S.C. § 3730(d)(2), he be awarded expenses, fees and costs in the amount of $9,274.16. The magistrate judge also recommended that defendants' cross-motion be denied. On August 28, 2009, the district court issued a one-page order overruling Bahrani's objections to the magistrate judge's recommendation and adopting that recommendation "*in toto* as its Order." Dist. Ct. Doc. 541 at 1 (italics in original).

## II

### A. Appeal No. 09-1163 (Bahrani's main appeal)

#### 1. Bifurcation/jurisdictional trial issues

Bahrani's first general issue on appeal focuses on the district court's decision to bifurcate the jurisdictional inquiry (i.e., whether Bahrani was an "original source" of his meat export certificate claims) from the merits of his meat and hide export certificates claims. In support, Bahrani asserts three specific arguments. First, he contends that bifurcating the jurisdictional inquiry from the merits of his claims constitutes error requiring a new trial. Second, he contends the district court improperly instructed the jury in the jurisdictional trial. Third, he contends the district court erred during the jurisdictional trial by admitting evidence of his prior litigation history. As discussed below, only one of these three arguments, i.e., the instructional challenge, has any merit, and that error does not warrant reversal. Thus, we affirm the portion of the district court's judgment arising out of the bifurcated original source proceedings.

##### a) The decision to bifurcate

Bahrani contends the district court's "decision to bifurcate the § 3730(e)(4) original source jurisdictional issue from the merits constitutes reversible error because jurisdiction is not 'clearly separable' from the merits." Aplt. Br. at 23 (quoting Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 964 (10th Cir. 1993)).

10

We review a district court's decision to bifurcate a trial for abuse of discretion. Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1285 (10th Cir. 1999). "District courts have broad discretion in deciding whether to sever issues for trial and the exercise of that discretion will be set aside only if clearly abused." Id. (quotation omitted). Federal Rule of Civil Procedure 42(b) authorizes a district court to "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ." Fed. R. Civ. P. 42(b).

Following our remand in Bahrani I, the district court "ordered the parties to confer and prepare a joint status report with . . . a framework for getting th[e] case to trial." Aplt. App. at 68-69. A status conference was held on August 21, 2007. On August 30, 2007, defendants filed a motion asking the district court to conduct "a hearing pursuant to Fed.R.Civ.P. 12(d) or the bifurcation provisions of Fed.R.Civ.P. 42(b), to determine the jurisdictional issue of whether [Bahrani] [wa]s an 'original source' as required by 31 U.S.C. § 3730(e)(4)." Id. at 35. In support, defendants asserted that "[t]he claims relating to meat certificates ma[d]e up the vast majority of [Bahrani's] case, and there [wa]s no reason to wait for trial to determine whether there [wa]s jurisdiction over those claims." Id. at 36. Defendants further argued that the original source issue was clearly separable from the merits because, "[a]lthough [Bahrani] would likely testify in both phases, the focus in the jurisdictional phase [would be] on [his] knowledge, while

11

the focus at a trial on the merits [would be] on Defendants' conduct." Id. at 42. Finally, defendants asserted that bifurcation would "promote judicial economy," id., because "an early ruling on the original source issue w[ould] define what discovery must be completed before trial," and if Bahrani was determined not to be an original source for the meat claims, there would "be no need to try the liability/damages issues related to those certificates, which constitute[d] the vast majority of certificates at issue." Id. at 43.

On January 29, 2008, the district court held a follow-up status conference, during which it addressed defendants' bifurcation request. Notably, Bahrani's counsel agreed to the bifurcation of the original source issue: "So my suggestion would be bifurcate it [the original source issue] but do it starting June 2nd [2008], two day trial, then we will be presenting evidence [at a second trial] one way or another on some certificates [either hides alone, or meat and hides, depending on the outcome of the original source trial]." Id. at 74. Ultimately, the district court agreed with this proposal and scheduled a three-day trial on the original source issue, to be followed at a subsequent date by a trial on the merits of the certificates determined to be at issue. Id. at 100.

As we see it, Bahrani effectively invited the district court to bifurcate the original source issue from the merits issues. Although Bahrani did not formally move to bifurcate, he ultimately agreed with defendants' motion and indeed urged the district court to bifurcate. Consequently, he is precluded under the invited

12

error doctrine "from arguing that the district court erred in" bifurcating.[2] United States v. Deberry, 430 F.3d 1294, 1302 (10th Cir. 2005).

*b) Instructional error at jurisdictional trial*

Bahrani next contends the district court improperly instructed the jury in the jurisdictional trial regarding the requirements for him to qualify as an "original source" under the FCA. Normally, "[w]e review de novo whether the [district] court erroneously instructed the jury on the applicable law." Gonzales v. Duran, 590 F.3d 855, 859 (10th Cir. 2009). If, however, a party did not preserve its challenge by timely objecting to an instruction in the district court, we review only for plain error. Therrien v. Target Corp., — F.3d —, 2010 WL 3095233 at *8 (10th Cir. 2010). "To obtain reversal on plain-error review, the appellant must satisfy a four-prong test." Id. "It must show (1) an error (2) that is plain, meaning clear or obvious under current law, and (3) affecting substantial rights." Id. (internal quotation marks omitted). "If these elements are satisfied, we may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted).

Before turning to Bahrani's specific challenges to the district court's

---

[2] Even if we were to assume the invited error doctrine did not apply in these circumstances, we are not persuaded the district court abused its discretion in bifurcating the original source issue. See Angelo, 11 F.3d at 964 ("Bifurcation is not an abuse of discretion if [the] interests [of judicial expedition and economy] favor separation of issues and the issues are clearly separable.")

13

"original source" instructions, we find it useful to first review the requirements a relator must satisfy to establish himself as an "original source" under the FCA, the relevant "original source" rulings in <u>Bahrani I</u>, the district court's handling of the "original source" issue on remand, including its instructions to the jury in the jurisdictional trial, and Bahrani's apparent failure to object to the district court's handling of the "original source" issue.

At all times relevant to this action, "[t]he FCA define[d] an 'original source' as 'an individual who ha[d] direct and independent knowledge of the information on which the allegations [we]re based and ha[d] voluntarily provided the information to the Government before filing an action under this section which is based on the information.'"[3] <u>In re Natural Gas Royalties</u>, 562 F.3d 1032, 1043 (10th Cir. 2009) (<u>Natural Gas I</u>) (quoting 31 U.S.C. § 3730(e)(4)(B)). "To establish original source status knowledge" under this definition, "a qui tam plaintiff [was required to] allege specific facts — as opposed to mere conclusions

_____

[3] The FCA's public disclosure bar, designed to prevent parasitic suits brought by relators with little or no direct knowledge of the alleged fraud, "remove[d] jurisdiction over an action 'based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or from the news media.'" <u>In re Natural Gas Royalties Qui Tam Litig.</u>, 566 F.3d 956, 961 (10th Cir. 2009) (<u>Natural Gas II</u>) (quoting 31 U.S.C. § 3730(e)(4)(A)). "The public disclosure bar ha[d] an exception for when 'the person bringing the action [wa]s an original source of the information.'" <u>Id.</u> (quoting § 3730(e)(4)(A)).

Effective March 23, 2010, the FCA's public disclosure bar, along with the original source definition, were amended by Congress. Pub. L. No. 111-148 (Mar. 23, 2010). The new amendments have no impact on the instant appeal.

14

— showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." Id. at 1045 (internal quotation marks omitted). "Secondhand information, speculation, background information, or collateral research d[id] not satisfy a relator's burden of establishing the requisite knowledge." Id. Finally, "the term 'allegations,'" as used in § 3730(e)(4)(B), were "not limited to the allegations of the original complaint," and instead "include[d] (at a minimum) the allegations in the original complaint as amended." Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473 (2007).

Turning to Bahrani I, this court reached two related conclusions that significantly affected Bahrani's burden of establishing that he qualified as an "original source." First, this court rejected Bahrani's assertion that the applicable regulatory framework required a new meat or hide certificate every time a correction was made. 465 F.3d at 1199. Instead, this court concluded, the evidence in the summary judgment record indicated that only "a certain class of changes," i.e., "major" or "significant" changes, might "require such certificates." Id. at 1200. Ultimately, this court concluded that Bahrani had submitted sufficient evidence, in particular an affidavit "stating that he personally observed the alteration of export certificates while he worked for Con[A]gra and . . . heard a supervisor authorizing such changes," id. at 1209, to survive summary judgment on the original source issue.

15

On remand, the district court, as noted, bifurcated and held an initial trial on the issue of whether Bahrani qualified as an "original source" for purposes of his meat-certificate claims. Immediately prior to this initial trial, the district court issued a pretrial order that stated, in pertinent part:

> In assessing whether Bahrani is "an original source" of the information underlying his claims, the jury does not need to determine Bahrani had direct and independent knowledge that Con[A]gra employees were making "major" (as opposed to minor) changes to export certificates and not securing replacement certificates, only that employees were making changes to certificates under circumstances where it was reasonable to conclude they should obtain replacement certificates and did not do so. Stated otherwise, Bahrani cannot be deemed an "original source" of information underlying a False Claims Act claim based on personal knowledge of activities he had no reason to believe were fraudulent.

> We will frame this requirement for the jury in terms of Bahrani's being the original source of information and activities he "reasonably believed" constituted an avoidance, on the part of Con[A]gra, of an obligation to obtain and pay for replacement certificates. <u>I am aware this articulates a new standard in the "original source" inquiry</u>, but the nature of Relator's reverse false claim in this action — and the fact that only "materially altered" certificates even fall within the FCA's scope as potential reverse false claims — requires the jury to be given some guidance in this area. At this stage of the proceedings, the jury is only making the threshold inquiry as to whether Bahrani is an "original source" of the information underlying his *reverse false claim*. That information as a threshold matter needs to be information that some wrong was being perpetrated to the detriment of the government. Bahrani's reasonable belief that "some wrong" was being committed is sufficient and Con[A]gra's request that the jury consider whether the changes he allegedly observed were "major" as opposed to "minor" changes is rejected. That said, however, Bahrani will not be able to establish he was "an original source" of information underlying his reverse false claims simply with evidence that he observed employees making "changes" to meat or hide export certificates.

16

Aplt. App. at 370-72 (underlining added; italics in original).

At the conclusion of all the evidence in the jurisdictional trial, the district court, consistent with its statements in the pretrial order, instructed the jury as follows:

> The information of which Mr. Bahrani must have had "direct and independent" knowledge to qualify as an "original source" of his meat certificate claims is information that Con[A]gra, through its employees, was defrauding the government out of fees it should have received for issuing replacement export certificates by making changes directly to those certificates rather than obtain corrected replacement certificates for a fee. For purposes of this trial, you do not need to decide whether Con[A]gra's actions did, in fact, constitute fraud, only that Mr. Bahrani is "an original source" of the information on which he bases his claim that it did or not.
>
> Accordingly, Mr. Bahrani's status as an "original source" is neither proven or disproven by the actual illegality of anything he observed. However, to be an "original source" of information that Con[A]gra employees were defrauding the government, Mr. Bahrani must have had "direct and independent" knowledge of facts he reasonably believed constituted fraud. A "reasonable belief" is one which a reasonable person in Mr. Bahrani's position would have believed to be true, under the circumstances. It is not enough, in other words, that Mr. Bahrani had "direct and independent" knowledge that Con[A]gra employees "made changes" to meat export certificates. Rather, he must have "direct and independent" knowledge that they were making those changes under circumstances where a reasonable person in Mr. Bahrani's position would have believed they were defrauding the government.

Id. at 859-60 (Instruction 3.7).

Although Bahrani now objects to this instruction on appeal, he does not identify in his opening appellate brief precisely where in the voluminous record on appeal he presented his objections to the district court. Having conducted our

17

own review of that record, we note that prior to trial Bahrani submitted proposed original source instructions that differed from those ultimately given by the district court. However, we have found no instance in which Bahrani objected to the district court's proposed original source instructions during the jury instruction conferences. Indeed, it appears from our review of the jury instruction conferences that Bahrani expressly agreed with the district court's proposed original source instructions. Id. at 756-57. Consequently, we review his appellate objections only for plain error.[4]

Turning to the merits of his arguments, Bahrani asserts that "[t]his Court [in Bahrani I] previously examined [his] affidavit wherein he reported [seeing] ConAgra employees altering export certificates and overheard a supervisor authorizing alterations," and held that "such information established [him] as an original source *even though* [he] did not work in the meat[] [documentation] department or understand the significance of what he was seeing." Aplt. Br. at 25 (italics in original). However, Bahrani complains, "[u]pon remand the district court impermissibly added a 'new standard' to [his] 'original source' burden of proof" by "instruct[ing] the jury that, to qualify as an 'original source,' [he] must have understood the significance of what he was seeing and hearing as it related to each and every element of his [FCA] allegation." Id. In other words, Bahrani

_____

[4] We are not persuaded the standard of review is outcome determinative. That is, as we discuss below, we do not believe, even under a de novo standard of review, that the district court committed reversible error.

18

asserts, "[t]he district court required, for the first time in FCA jurisprudence, that a relator must have held a subjective belief that the defendant was intentionally committing fraud on the government to meet the minimum jurisdictional threshold of an 'original source.'" Id.

We agree with Bahrani on this point. Neither the FCA nor applicable case law indicated that a relator's subjective belief was a component or element of the original source test as it existed at the time of the remand proceedings in this case. Instead, as the language of the FCA made clear, the relator simply had to establish that he had "direct and independent knowledge of the information on which [his FCA] allegations [we]re based . . . ." 31 U.S.C. § 3730(e)(4)(B) (2008). As applied here, that means, given the rulings in Bahrani I, which are the law of the case, that the jury should have been asked to decide whether Bahrani had direct and independent knowledge that ConAgra employees were making "major" or "significant" changes to certificates (and not whether he reasonably believed that the changes he actually observed were fraudulent). See generally Rockwell, 549 U.S. at 473 (emphasizing that qualification as an original source required the relator to have information upon which the relator's allegations, as ultimately amended, were based). In other words, Bahrani had to establish he was "personally aware of at least one instance of [a] fraudulent" certificate change

19

(i.e., a "major" or "significant" certificate change).[5] <u>Glaser v. Wound Care Consultants, Inc.</u>, 570 F.3d 907, 921 (7th Cir. 2009).

Assuming that Bahrani can satisfy the first two prongs of the plain error test, we conclude he cannot satisfy the third prong of that test, i.e., that the alleged error affected his substantial rights. The heart of Bahrani's original source evidence was his testimony that, although he worked exclusively in the hide documentation department and had never been trained to complete meat export certificates, he often visited employees he knew who worked in the nearby meat documentation department, and on more than one occasion observed employees in that department "altering" meat export certificates. Aplt. App. at 432. Specifically, Bahrani testified he "saw the use of white-out," "erasers being used," "export certificates in the typewriters," <u>id</u>. at 433, and meat export certificates that had "different typewritten face on them." <u>Id.</u> at 475. Bahrani also testified that on more than one occasion he heard Lotfollah Sabzevari, a supervisor in the meat documentation department, give a subordinate permission to change a USDA meat export certificate. Lastly, Bahrani testified that on one occasion a country that was to receive hides from ConAgra insisted upon getting a

---

[5] In his opening appellate brief, Bahrani suggests that his "personal observations while working at ConAgra — witnessing alterations or overhearing a supervisor authorizing alterations — were all that were required to confer original source status." Aplt. Br. at 28. But this is wrong. As outlined above, this court's holdings in <u>Bahrani I</u> required Bahrani to establish that he was personally aware of at least one instance of a "major" or "significant" certificate change.

20

meat export certificate. Notably, Bahrani conceded on cross-examination that every time he changed a certificate, it was for the purposes of correcting erroneous information. Bahrani further conceded that it was impossible to tell just by looking at an export certificate, even if it had a piece of eraser tape on it or a change in typeface or anything else, what precisely had happened with it, and whether or not a replacement certificate may ultimately have been issued for it. In short, Bahrani's knowledge of what transpired in the meat export certificates department was far too limited to allow a jury to reasonably find that he was an original source for his meat export certificate claims. Thus, we conclude Bahrani's substantial rights were not adversely impacted by the district court's instructional error.[6]

*c) Admission of evidence regarding Bahrani's prior litigation history*

In his third and final challenge to the jurisdictional trial proceedings on remand, Bahrani contends the district court erred in allowing ConAgra to cross-examine him regarding his participation in prior lawsuits. "We review a [district] court's evidentiary rulings for an abuse of discretion, according 'deference to a

---

[6] For essentially the same reasons, we are not persuaded the district court's instructional error seriously affected the fairness, integrity, or public reputation of the underlying judicial proceedings. Likewise, even if we were to assume that Bahrani timely objected to Instruction 3.7 and we could thus review the error de novo, we are not persuaded the error was prejudicial. Sherouse v. Ratchner, 573 F.3d 1055, 1059 (10th Cir. 2009) ("An erroneous jury instruction requires reversal . . . only if the error is determined to have been prejudicial, based on a review of the record as a whole.") (internal quotation marks omitted).

21

district court's familiarity with the details of the case and its greater experience in evidentiary matters.'" Frederick v. Swift Transp. Co., — F.3d —, 2010 WL 3122883 at *5 (10th Cir. 2010) (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)).

Prior to the jurisdictional trial, Bahrani filed a motion in limine seeking to exclude evidence of his litigation history. The district court granted Bahrani's motion in part "to exclude testimony [of Bahrani] alleging national origin discrimination against three employers; filing lawsuits against two different employers alleging national origin discrimination; filing discrimination charges against four prospective employers for not hiring him, ultimately suing two of them." Aplt. App. at 298-99. The district court also granted Bahrani's motion to exclude evidence of his "filing discrimination charges against two newspapers that ran ads for jobs for which he was not hired; filing a grievance against a former lawyer and suing a former lawyer." Id. at 299. The district court denied Bahrani's motion in part and agreed to "permit evidence to show bias, prejudice that he has accused three employers of forcing him to falsify records or documents twice in litigation that he brought against those employers." Id. The district court advised that its rulings were subject to change at trial and that Bahrani should "be very careful" not to open the door to further inquiry. Id. at 300-01.

Bahrani was the first witness to testify at the jurisdictional trial. During his

22

direct examination, he and his counsel engaged in the following exchange regarding his knowledge of Rule 26 disclosures, which pertained to the question of whether Bahrani's FCA claims were "based upon" information publicly disclosed during the "Kim litigation" in California, see Bahrani I, 465 F.3d at 1208 (discussing Kim litigation):

> Q. So May 25th, 2000 you filed your False Claims Act case against the defendants. And I want to ask you in 1998, August of 1998 when you went to the FBI, did you know what a False Claims Act case was?
>
> A. No, I did not.
>
> Q. Had you ever heard of the False Claims Act?
>
> A. No, not until later.
>
> Q. You were also – let me – strike that. Also during opening statement Mr. Waas [ConAgra's counsel] talked to the jury about disclosures, Rule 26 disclosures in this case. Do you recall that in his opening statement?
>
> A. Yes, I do.
>
> Q. Do you know what a Rule 26 disclosure is?
>
> A. No, I don't.
>
> Q. Do you know what the purpose of a Rule 26 disclosure is?
>
> A. It has something to do with disclosure.
>
> Q. Did you prepare any Rule 26 disclosures in this case, you personally?
>
> A. No, I did not.

Q.  Do you know what the lawyers are required to disclose in a Rule 26 disclosure?

A.  No, I don't.

Q.  Did you collect any or obtain any of the documents that are identified in the Rule 26 disclosure?

A.  I don't even know what they are.

Q.  Well, you recall Mr. Waas was relating that all of these documents [came] from the Kim litigation.  Do you recall that?

A.  Yes, I do.

Q.  Did you obtain those documents from the Kim litigation?

A.  No, I did not.

Q.  Did you review any documents from the Kim litigation?

A.  No, I did not.

Q.  Okay.  One other thing here.  Let's see if I can find that.  Okay. It's Defendant's Exhibit K.  This is what Mr. Waas was talking about, the Rule 26 disclosure.  You see that?

A.  Yes, I do.

Q.  Okay.  And again, if we go to the back here, if we can get there, do you see the date on those disclosures?

A.  February 2002.

Q.  Okay.  And again, is that before or after you filed this False Claims Act case?

A.  Well, I filed my False Claims Act case in 2000, so it was almost two years later that this disclosure happened.

Aplt. App. at 470-72.

24

During cross-examination, ConAgra's counsel engaged in the following exchange with Bahrani:

Q. Mr. Ulmer [Bahrani's counsel] showed you – remember those Rule 26 disclosures that I used in my opening statement that had all those references to the <u>Kim</u> litigation?

A. Yes, sir.

Q. Mr. Ulmer asked you a little bit about whether you even knew what Rule 26 disclosures were, and I think you said you really don't know.

A. All I know is it's about disclosure.

Q. Mr. Bahrani, you have been involved in litigation before, haven't you?

A. Yes, I have.

Q. You, in fact, served as your own attorney in litigation, haven't you?

A. Yes.

Q. Many times?

   MR. ULMER: Objection, Your Honor, relevance.

   THE COURT: Overruled.

A. I don't remember how many times I represented myself.

Q. Take a stab.

A. I think three times, four times.

Q. And how many times with a lawyer that you have worked with?

A. I don't remember the total.

Q. More than a dozen?

A. Possibly.

Q. So you have been around the litigation block a few times, Mr. Bahrani, haven't you?

A. Yes.

Q. As a plaintiff?

A. Yes.

Q. You understand the concept that in a lawsuit a plaintiff has to come forward with information to support their claim at some point, right?

A. Yes.

Q. And you may not know exactly which Rule 26 whatever [sic] that required someone to come forward with information in this case, but you are very familiar with that process, that if you make a claim you have to come forward and you have to say what supports your claim, right?

A. Right.

> MR. ULMER: Objection, Your Honor. I don't think that's what the testimony is and I think it's irrelevant.
>
> THE COURT: It's not irrelevant. The direct testimony talked about his familiarity or lack there [sic] with the rules, discovery rules, Rules of Civil Procedure. The objection to the last question, however, is sustained. You can rephrase.

Q. Mr. Bahrani, you are familiar with the disclosure process and how that works in litigation, aren't you?

A. I am generally, roughly familiar with it.

Q. And you understand that when you are the plaintiff, when you are

26

the party seeking recovery in a lawsuit, you have obligations to disclose information to the other side, correct?

A. Yes.

Q. And you know that because you have been the plaintiff in many cases. Can we just say many?

A. Yes.

Aplt. App. at 480-82.

Bahrani now contends on appeal that "[a]llowing this line of questioning [on cross-examination] was error." Aplt. Br. at 37. Specifically, Bahrani contends the testimony was "irrelevant because [his prior lawsuits] involved different types of cases, such as discrimination, and different defendants, such as former employers, prospective employers, and newspapers." Id. at 38. "Beyond being irrelevant," Bahrani also contends, "evidence of [his] prior lawsuits is unfairly prejudicial, substantially outweighing any probative value." Id. "The risk," he contends, "is that evidence of prior lawsuits persuades a jury to conclude that [he] simply acted in conformity with his purported character trait, and that his claims lacked merit." Id.

Bahrani's arguments notwithstanding, we conclude the district court did not abuse its discretion in allowing ConAgra to cross-examine Bahrani regarding his prior litigation history. As noted by defendants, Bahrani effectively "opened the door" to this cross-examination by attempting to suggest to the jury, by way of his testimony that he was unfamiliar with the FCA and knew essentially nothing

27

about Rule 26 disclosures, that he was unfamiliar with the litigation process and that his motives in reporting ConAgra's alleged fraud to the FBI were innocent, i.e., that he was not motivated by the desire to file suit against ConAgra.[7]

### 2. *Hide export certificate trial issues*

Bahrani contends the district court committed five errors during the hide export certificates trial: (a) it erroneously excluded all evidence of official USDA policy; (b) it gave erroneous materiality instructions; (c) it erroneously took judicial notice of the Department of Justice's (DOJ's) involvement in the case; (d) it allowed a witness, not authorized by Federal Rule of Evidence 615, to remain present during the trial; and (e) it admitted the hearsay affidavit of a witness that did not fit into any exception to the hearsay rule. As we discuss below, however, none of these challenged rulings constitute reversible error.

### a) *Exclusion of USDA policy*

Bahrani contends "[t]he district court erroneously excluded evidence of USDA policy by striking testimony of Dr. Joyce Bowling, an Assistant Director for the Technical Trade Services Department of the USDA's Animal Plant Health Inspection Service (APHIS), and excluding government documents reflecting that policy . . . ." Aplt. Br. at 39. We review for abuse of discretion the district

---

[7] Even assuming, for purposes of argument, that the district court abused its discretion in allowing the cross-examination, the error was harmless. As we have already discussed, Bahrani lacked the information necessary to establish himself as an "original source" of his meat export certificate claims, and thus was not prejudiced by the cross-examination regarding his prior litigation history.

28

court's evidentiary rulings. <u>Frederick</u>, — F.3d —, 2010 WL 3122883 at *5.

Following this court's decision and remand in <u>Bahrani I</u>, Bahrani located a new witness, Bowling, to testify on his behalf regarding the issue of what certificate changes were "major" or "significant" and thus violative of the FCA under the law of the case. In turn, Bahrani filed a pleading with the district court indicating he intended to present Bowling as a witness at trial and stating she would testify that, according to a memo she drafted and purportedly distributed to USDA area offices and veterinarians, i.e., USDA Memorandum 594.1, the making of any changes to hide export certificates was a prohibited practice. In other words, Bahrani sought to present testimony from Bowling that all certificate changes were "significant" or "major." ConAgra moved for an order prohibiting Bowling from so testifying. In support, ConAgra argued that this court in <u>Bahrani I</u> had already considered and rejected Bahrani's assertion that all certificate changes were prohibited under the FCA, and that Bowling's proposed testimony was thus in conflict with <u>Bahrani I</u>.

The district court held a hearing on ConAgra's motion. The district court stated at the outset that it was "not going to consider or reconsider the legal standards articulated and applied by the Tenth Circuit in [<u>Bahrani I</u>], certainly not before trial . . . ." Aplt. App. at 1233. Bahrani's counsel argued that the decision in <u>Bahrani I</u> was "[b]ased in [sic] the limited summary judgment record, the snapshot in 2004," <u>id.</u> at 1236, and that the record "developed since 2004" was

different and should be submitted to the jury.  Id. at 1237.  Bahrani's counsel

further argued that "[n]either the Tenth Circuit nor [the district court] ha[d] made

any findings of law on [USDA] policy," and that Bowling would testify regarding

USDA policy (specifically that it was contrary to the conclusions reached by this

court in Bahrani I).  Id. at 1247.  The district court ultimately rejected Bahrani's

position and granted ConAgra's motion.  In doing so, the district court stated:

> But I cannot read the Tenth Circuit opinion the way that the
> relator wants me to read in this case.  It is totally inadmissible
> whether Dr. Bowling thinks there is no such thing as a minor change
> or not.  The Court of Appeals has spoken, and at 465 F.3d in its
> conclusion under Part 3 the Court says this, and I quote:

> "As applied to these circumstances we read Section 3729(a)(7)
> more narrowly than Mr. Bahrani, but more broadly than ConAgra.
> Like the District Court, we are not persuaded that every change to a
> signed export certificate made by a ConAgra employee creates an
> obligation under the statute.  However, to the extent that ConAgra
> employees made 'major' or 'significant' changes without applying
> for 'in lieu of' or replacement certificates, they avoided an obligation
> under Section 3729(a)(7).

> "We emphasize that the appropriate inquiry is certificate-
> specific," it's not a policy issue.  I am interposing that statement.

> To continue with the quote, "Because of their interpretations of
> the regulatory scheme, both Mr. Bahrani and ConAgra have advanced
> arguments that pertain to all changes to original export certificates no
> matter how extensive.  In our view, however, whether a given change
> to an original certificate triggers a 3729(a)(7) obligation depends
> upon the nature of the change, whether it is 'major' or 'significant'
> and thus requires a new certificate.  Although many of the
> unauthorized changes alleged by Mr. Bahrani appear to be minor,
> there is evidence that at least some of them fell within the 'major' or
> 'significant' class.  Further development of the record is required to
> determine the extent to which ConAgra employees made 'major' or

30

'significant' changes without obtaining 'in lieu of' or replacement certificates and paying the accompanying fee."

We have to have a trial in which the hide certificates are examined and determine whether they contain major or minor changes; and if major, then they are required to apparently get the fee and whatever damage might ensue from that.

But the testimony of Dr. Bowling, or the proposed testimony, to the effect that all changes require the certificate will not be admitted, and the motion is granted to that extent.

* * * * And I have to instruct the jury that as a matter of law decided by the Tenth Circuit, not U.S.D.A. policy, which won't go before them, but as a matter of law a legal obligation occurs only when there is a major change, and the jury's decision will have to be based upon expert testimony. It cannot be and it would be highly prejudicial to have some government official come in at the eleventh hour after all the discovery and say: They're all major. That is a direct contradiction of what the instructions are to us.

So, as I've indicated, she will not be allowed to testify to that at all.

* * * *

I don't know whether you [Bahrani] are going to try to call Dr. Bowling or not. But I can tell you she's going to be on a very short leash, and any attempt on her part to contravene or attempt to contravene the holding as I have read it and as I interpret it will be met with severe response. So I don't know if you want to call her or not, that's up to you.

Id. at 1251-55. The district court subsequently issued a written order reiterating its conclusions. Aplee. Supp. App. at 356 ("Because only the making of a 'major or significant' change to an export certificate triggers a § 3729(a)(7) obligation for purposes of FCA liability, Dr. Bowling's testimony that there is no such thing

31

as a 'minor' or authorized change under the USDA regulatory scheme does not justify a change in the Tenth Circuit's reasoning or the law of the case.").

At trial, Bahrani proceeded to present Bowling as a witness. Bowling testified, among other things, about how export certificates are reissued and the frequency with which certificates are reissued. Although Bahrani's counsel sought to question her about the contents of USDA Memorandum 594.1, the district court prohibited him from doing so. Aplt. App. at 1777. The district court also prohibited Bahrani's counsel from questioning Bowling about the specific hide export certificates at issue in the case. Id. at 1780. Indeed, the district court ruled that Bowling could not testify at trial as an expert witness because she did not, prior to trial, file a proper expert report.[8] Id. at 1781.

On appeal, Bahrani contends the district court erred in interpreting Bowling's proposed testimony as inconsistent with Bahrani I. More specifically, he contends that this court in Bahrani I "clearly did not anticipate that all of the evidence that would be developed had been developed and there would be no

_____

[8] ConAgra's counsel argued in this regard:
Your Honor, we raised, many months ago, the question of whether Dr. Bowling ought to be permitted to testify whether changes were major or minor; and the Court ruled unequivocally and several times that she cannot. They're trying to get her to say the same thing in the form of opinions. They did no Rule 26 disclosure. They just now handed her a stack they say constituted 30 categories of documents. And I just saw that 30 seconds ago. That's what I would have gotten under Rule 26.
Aplt. App. at 1782-83.

further evidence — freezing the record in time." Aplt. Br. at 45.

We reject Bahrani's contentions. As the district court correctly noted in precluding Bowling's proposed testimony, Bahrani I expressly rejected Bahrani's argument that every change necessitated a new certificate. 465 F.3d at 1199 (concluding that Bahrani's submitted evidence "d[id] not support the theory that new certificates are required every time a correction must be made"), ("we therefore do not agree with Mr. Bahrani's expansive reading of the USDA statutes and regulations"). Further, Bahrani I held that only "major" or "significant" changes necessitated a new certificate. Id. at 1200. Although the Bahrani I decision employed the phrase "we conclude from this record," id., and also stated that "[f]urther development of the record [wa]s required," id. at 1209, nothing in Bahrani I indicated that Bahrani was free to gather additional evidence for the purpose of reasserting that all export certificate changes required replacement certificates. Rather, the clear import of Bahrani I was that the parties would engage in additional limited discovery regarding only "the extent to which Con[A]gra employees made 'major' or 'significant' changes without obtaining 'in lieu of' or replacement certificates and paying the accompanying fee." Id. Although Bahrani and Bowling clearly disagreed with Bahrani I's distinction between "major" or "significant" changes and other minor certificate changes, they were bound by that ruling under the law of the case doctrine, as was the district court. See McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1034

33

(10th Cir. 2000) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quotations, alterations, and citations omitted)). Thus, the district court did not abuse its discretion in precluding Bowling from testifying.

*b) Instruction 3.4 - defining major or significant change*

Bahrani next contends the district court gave what Bahrani describes as an erroneous and prejudicial materiality instruction, i.e., Instruction No. 3.4, during the hide export certificates trial. "We review de novo whether the [district] court erroneously instructed the jury on the applicable law." Gonzales, 590 F.3d at 859.

Instruction No. 3.4, entitled "'MAJOR' OR 'SIGNIFICANT' CHANGE – DEFINED," stated as follows:

> As you have already been told, there is no requirement under USDA statutes or regulations that an exporter must obtain a replacement certificate every time a change to an existing certificate is made. It is the law of this case that only the making of "major" or "significant" changes triggers an obligation to obtain and pay for a replacement certificate.

> That is not to say that the law allows exporters to change certificates at will or that it is not unlawful to do so. There are, in fact, laws that prohibit exporters from making any kind of unauthorized change or alteration to a government-issued certificate and which subject exporters to administrative fines and penalties if they do so. These laws say nothing, however, about replacement certificates and say nothing about when an exporter who wishes to make a change to a certificate must get a replacement certificate to

34

do so.  For this reason, it is not a Con[A]gra employee's making of a correction or change to a certificate that creates an "obligation" under the law to obtain a replacement certificate and pay the fee at issue in this case.  Instead, that obligation arises from the discovery, by the employee making the correction, that a "major" or "significant" change is necessary.

You will hear considerable testimony from various witnesses about what does and does not constitute a "major" or "significant" change to a hide export certificate.  All I can tell you about what "major" or "significant" means is that it embodies a principle of materiality.  Something is "material" if it has the tendency to influence or persuade a person to act in a certain way.  As it is contemplated in this case, a "major" or "significant" change is one that would have influenced or persuaded the certifying official that a replacement certificate was, in fact, required.

Aplt. App. at 2400-01.  Bahrani objected to the last sentence of the last paragraph of the instruction, asserting that the word "would" should be replaced with the word "could."  Id. at 1303-04.  Bahrani's objection was overruled and the instruction was given as originally worded by the district court.

Bahrani argues on appeal that Instruction 3.4's use of the word "'would' instead of 'could' impermissibly increased the standard beyond that required by Bahrani I, elevating the standard from one focusing on the potential effect of the change and a 'tendency to influence,' to one requiring certainty."  Aplt. Br. at 48.  Bahrani further argues that "[u]se of the word 'would' in reference to the 'certifying official' impermissibly emphasized the importance of an individual official's decision rather than keeping the proper focus on *agency* action."  Id. (italics in original).  In sum, Bahrani asserts, "[t]his instruction conflicts not only

35

with the decision in <u>Bahrani I</u>, but also with the intent of the FCA."  <u>Id.</u>

To date, we have never directly addressed whether civil claims under the FCA incorporate a materiality element and, if so, what the proper test is for materiality.[9]  That said, the decision in <u>Bahrani I</u> referred to the concept of materiality by concluding "that there is a certain class of [certificate] changes," i.e., "major" or "significant" changes, "that . . . <u>require</u> [replacement certificates." 465 F.3d at 1200 (emphasis added).  Indeed, <u>Bahrani I</u> held that "[t]his agreed description of the circumstances in which the USDA requires exporters to obtain new certificates . . . adopts a principle — materiality — that has been widely employed in various circumstances, including False Claims Act actions."  <u>Id.</u>

The instruction now challenged by Bahrani clearly tracks <u>Bahrani I</u> by

---

[9]  Several circuits have concluded "that a civil claim brought under the FCA includes a materiality requirement" for the false claims at issue.  <u>U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.</u>, 400 F.3d 428, 441-42 (6th Cir. 2005).  The majority of these circuits, i.e., the First, Fourth, Fifth, Sixth and Ninth Circuits, have "adopted a natural tendency test for materiality, which focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered."  <u>U.S. ex rel. Hutcheson v. Blackstone Med., Inc.</u>, 694 F. Supp. 2d 48, 63-64 (D. Mass. 2010) (internal quotation marks omitted).  "[A]ll that th[is] test requires is that the false or fraudulent statement is capable of influencing the Agency's decision."  <u>U.S. ex rel. Loughren v. Unum Grp.</u>, — F.3d —, 2010 WL 2951175 at *7 (1st Cir. 2010).  "In contrast, the Eighth Circuit relies upon an 'outcome materiality test,' which requires a showing that the defendant's actions (1) had the purpose and effect of causing the United States to pay out money it [wa]s not obligated to pay, or (2) intentionally deprive[d] the United States of money it is lawfully due."  <u>Hutcheson</u>, 694 F. Supp. 2d at 64 (internal quotation marks omitted).  We find it unnecessary in the context of this case to resolve which, if either, is the proper test for materiality.  Instead, we simply conclude that the district court's instruction was proper under the law of the case as established by <u>Bahrani I</u>.

36

informing the jury that the terms "major" and "significant" "embod[y] a principle of materiality."  As for the instruction's use of the phrase "would have influenced," instead of the "could have influenced" language suggested by Bahrani, we conclude this language was necessary to properly enforce Bahrani I's distinction between so-called "major" or "significant" changes and other, "minor" changes that did not require the issuance of a new certificate.  As ConAgra persuasively argues, if the instruction had said "could have influenced," it would have effectively allowed Bahrani to argue (as he persisted in doing below and continues to attempt to do on appeal) that literally all certificate changes were major or significant; a position clearly foreclosed by Bahrani I.  Thus, in sum, the challenged instruction was consistent with, and indeed mandated by, Bahrani I.

Bahrani also complains about Instruction 3.4's use of the phrase "certifying official," arguing it should have instead utilized the terms "'an agency official' or 'an official action on behalf of the agency.'" Aplt. Br. at 54.  Notably, however, Bahrani failed to assert that objection below, and indeed effectively invited the alleged error by proposing that the district court refer to "the United States government official who endorsed the original certificate."  Dist. Ct. Doc. 317 (Proposed Instr. No. 3.1).  Thus, we decline to address Bahrani's argument.

*c) Designation of Mark Gustafson as defendants' representative*

Bahrani contends the district court erred in allowing Mark Gustafson to appear as defendants' representative and remain present during the testimony of

37

other witnesses at both trials, rather than being sequestered.  We review for abuse

of discretion a district court's sequestration decisions.  See United States v.

Samuels, 493 F.3d 1187, 1190-91 (10th Cir. 2007).

Federal Rule of Evidence 615 authorizes a district court to "order witnesses

excluded so that they cannot hear the testimony of other witnesses . . . ."  Fed. R.

Evid. 615.  The Rule also exempts certain classes of witnesses from sequestration

orders.  In particular, subsections (2) and (3) of Rule 615 provide that a

sequestration order does not apply to "an officer or employee of a party which is

not a natural person designated as its representative by its attorney" or "a person

whose presence is shown by a party to be essential to the presentation of the

party's cause . . . ."  Id.

At the beginning of the jurisdictional trial in this case, Bahrani's counsel

asked that the witnesses be sequestered pursuant to Rule 615.  The district court

granted that motion.  Gustafson, who worked at ConAgra's Greeley, Colorado

facility continuously throughout its ownership by ConAgra, including during the

time frame relevant to the claims asserted by Bahrani,[10] remained in the

courtroom, as defendants' representative, throughout the jurisdictional trial.

Gustafson testified at the trial and was asked by defense counsel to respond to

---

[10] According to the record, Gustafson continued to work at the Greeley facility after Swift & Co. acquired it from ConAgra.  And, at the time of trial, Gustafson remained employed at the Greeley facility under its ownership by JBS Swift & Company (JBS).

various witnesses' testimony.

On the first day of the hide export certificates trial, prior to the admission of any evidence, Bahrani's counsel objected to Gustafson appearing as a representative for ConAgra and sitting at ConAgra's table throughout the trial. In support, Bahrani's counsel argued that Gustafson "was no longer an officer or employee of any of the corporate defendants in the case" and "had not been since 2002 . . . ." Aplt. App. at 1330-31. The district court denied Bahrani's request, stating: "I think each side's entitled to have an advisory witness, and the designated witness can be present throughout the trial to assist counsel. It would be grossly unfair, in my view, to require the defendants to have some representative of the company who knew absolutely nothing about the case or wasn't there to try and advise them." Id. at 1331.

We conclude the district court acted well within its discretion in allowing Gustafson to remain in the courtroom throughout both trials. As noted by defendants, it appears that the current owner of the Greeley facility, JBS, even though never named as a party defendant, "is financially responsible for this litigation and is therefore the real party in interest." Aplee. Supp. App. at 223-24. Consequently, Gustafson effectively qualified as a party representative under the terms of Rule 615(2). Alternatively, Gustafson could reasonably be classified as "a person whose presence is shown by [the defendants] to be essential to the presentation of the[ir] . . . cause," and thus fell within the exception outlined in

39

Rule 615(3). More specifically, he was, as noted by defendants, "the person most knowledgeable about the history and complex factual details of the matters at issue, and with whom counsel needed to confer during trial," "the Defendants' designated representative in the Kim case," "the employee responsible for coordinating the USDA investigation, and . . . the only witness with direct personal knowledge about the scope of that investigation — a critical issue in the jurisdictional trial because of the 'based-upon' requirement, and in the hide export certificates trial because of the government knowledge instruction." Aplee. Br. at 57.

*d) Judicial notice of government's position on allowing changes*

During the cross-examination of Dr. Bowling at the hide export certificates trial, defense counsel asked Bowling, "Are you aware that prior to your testimony today, there's not a single instance in the nine-year history of this lawsuit where the Department of Agriculture has ever taken the position that a veterinarian should have declined to make minor changes [to hide export certificates]?" Aplt. App. at 1815. Bowling responded, I don't know what the Justice Department has done previously." Id. at 1816. Defense counsel then asked the district court to "take judicial notice that in pleadings filed in this case to date, the nine-year history of the case, the USDA has never taken the position that minor changes cannot be made to export certificates, in any pleading they filed." Id. The district court responded as follows:

40

I can take judicial notice of the files. Let me explain, ladies and gentlemen of the jury, what that means.

Judicial notice, which I explained in the instructions when I read them all to you, relates to certain things that we can take as proved, the simplest one would be a commonly accepted geographic or meteorological fact, such as the sun rises in the east and sets in the west. Another one is that we can say that the Postal Service delivers — that's stretching it, but, you know, that they deliver mail.

Then one of the things we can do is to take judicial notice of the court's files, so rather than bring all the files here, I can say, that's the case, and you can accept it as true. How much weight you give to it, what you do with it, is entirely up to you.

But I do take judicial notice of the files and I do take judicial notice of the statement made by [defense counsel], that there is nothing in the files that, that relates to the government — the Department of Justice taking a position on this.

Id. at 1816-17.

Bahrani now contends on appeal that the district court erred in taking judicial notice of this fact. According to Bahrani, "[t]he evidence was wholly irrelevant and was presented completely out of context, unfairly and unduly prejudicing [him] and misleading the jury." Aplt. Br. at 56. More specifically, Bahrani complains that "[t]aking judicial notice that the DOJ did not take a position that minor changes were prohibited . . . inferred . . . that the USDA had no policy, or at a minimum, the policy was unclear, or that the government was not interested in the outcome." Id. Relatedly, Bahrani argues that "[w]hether the DOJ intervenes, or actively 'takes a position' [in an FCA case] is irrelevant because it does not make any fact at issue more likely true than not." Id.

41

Generally speaking, a district court's decision whether to take judicial notice of facts is reviewed for abuse of discretion. United States v. Williams, 442 F.3d 1259, 1261 (10th Cir. 2006). Here, however, Bahrani's counsel did not assert a contemporaneous objection to the district court's decision to take judicial notice. Accordingly, we review the district court's decision only for plain error. United States v. Foust, 457 F.2d 653, 654 (10th Cir. 1972).

After examining the record on appeal, we agree with Bahrani that the district court erred, in the course of explaining its action to the jury, by referring to the "Department of Justice" rather than the USDA. But we in turn conclude that this error was not prejudicial to Bahrani, since the jury heard both defense counsel's questioning of Bowling and defense counsel's subsequent and detailed request for the district court to take judicial notice, all of which expressly referred to the USDA rather than the DOJ.

That minor error aside, we conclude the district court did not err in taking judicial notice that the USDA had never taken an official position regarding whether minor certificate changes were prohibited. Although Bahrani suggests "the USDA did take [the] position" that such changes were prohibited, Aplt. Br. at 58, and notes that he proffered Bowling's testimony to that effect, that testimony was properly excluded by the district court as inconsistent with the holdings in Bahrani I. In other words, as we have noted, the district court and parties were bound under the law of the case doctrine by Bahrani I's legal

42

determination that minor certificate changes were not violative of the FCA's reverse false claims provision.

*e) Admissibility of Brad Schmeh's affidavit*

Lastly, Bahrani contends the district court erred in admitting at the hide export certificates trial an affidavit from an individual named Brad Schmeh. As previously noted, "[w]e review a [district] court's evidentiary rulings for an abuse of discretion, according deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters." Frederick, — F.3d —, 2010 WL 3122883 at *5 (internal quotation marks omitted).

At the time of trial, Schmeh was "the owner and operations manager of Interlogistix, Inc.," a Denver-based "freight forwarder . . . responsible for facilitating the transportation and export of ConAgra Beef Company's animal hides from its various beef plants, [sic] to various importing countries." Aplt. App. at 6. Schmeh's affidavit outlined the export process employed by Interlogistix. Id. at 6-7. The affidavit then discussed the topic of errors in and changes to hide export certificates:

> 10. Occasionally, it comes to my attention that I have made a typographical error or otherwise included incorrect information on the export certificate, such as a transposition of numbers in the container number, or a consignee's name spelled incorrectly. I then contact the USDA veterinarian, give him the certificate number, and request permission from ConAgra to make changes. Once I have received permission, I fax a copy of the changed certificate to the veterinarian. An example of this type of request and permission is illustrated in the email attached hereto as Exhibit 2, which was sent

43

to and received from Dr. Diemer of APHIS in Lakewood, Colorado.

11. On every occasion that I have requested permission to make corrections on an export certificate, the APHIS veterinarian has granted that permission.

12. In some circumstances, I do obtain a replacement or in-lieu-of certificate, rather than making changes directly on the certificate. Those circumstances would include situations where the customer needs an entirely different shipment, or if the weights used for the hides are completely wrong as opposed to one digit being incorrect or transposed.

Id. at 7-8.

The attached e-mail messages referred to in Schmeh's affidavit were between Schmeh and Dr. Ian Stewart, a USDA veterinarian, and between Schmeh and a ConAgra employee. Id. at 10. In the first e-mail message, Schmeh stated to Stewart, in pertinent part: "Please note that ConAgra needs to change a digit on a container number . . . . Once they have made the change, I will fax a copy for your file. Please just respond saying ok." Id. The second e-mail message, from Dr. Stewart to Schmeh, stated simply: "OK." Id. In the third and final message, Schmeh forwarded a copy of the first two messages to a ConAgra employee and wrote: "Here is the ok from the USDA to change the H/C [hide certificate]. Please fax me the revised copy on Monday." Id.

Prior to trial, Bahrani moved to exclude both the affidavit and the exhibit on the grounds of relevance and hearsay. The district court denied that motion. Bahrani then moved to reconsider, this time agreeing to stipulate to foundation for

the exhibit, but continuing to object to admission of the affidavit.  The district court denied the motion to reconsider and admitted both the affidavit and accompanying exhibit pursuant to Federal Rule of Evidence 803(3).[11]

Bahrani contends the district court erred in admitting the affidavit pursuant to Rule 803(3), arguing "that factual recitations of events and the belief as to the cause of the events do not meet the 803(3) exception."  Aplt. Br. at 63 (citing Allen v. Sybase, Inc., 468 F.3d 642 (10th Cir. 2006)).  We agree.  Rule 803(3) permits the admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ."  Fed. R. Evid. 803(3).  In other words, Rule 803(3) "permits an out-of-court statement regarding a declarant's then-existing state of mind where the statement serves as evidence of the declarant's intent to perform an act."  Allen, 468 F.3d at 659.  Schmeh's affidavit does not fit within this exception because it does not outline Schmeh's then-existing state of mind, nor was it presented by defendants for the purposes of evidencing Schmeh's intent to perform a particular act.  Moreover, although defendants argue on appeal that "Schmeh's affidavit was not used to prove the truth of the matter asserted," Aplee. Br. at 50, that is refuted by the record.

[11] Defendants used the exhibit with several witnesses, including Mariana Lambert, Bahrani's former supervisor.  In particular, Lambert agreed that the practices described in Schmeh's affidavit were consistent with her understanding of freight forwarders' practices between 1996 and 2000.  Defendants also used the exhibit during their cross-examination of Dr. Bowling.

45

Indeed, the record indicates that Schmeh's affidavit was offered by defendants precisely to demonstrate, at least in part, that its freight forwarders routinely requested and received permission from USDA veterinarians to make changes to hide export certificates.

The question then becomes whether the erroneous admission of Schmeh's affidavit was harmless. "Evidentiary errors are not grounds for reversal unless the aggrieved party shows the admission of the evidence was not harmless." U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd., 582 F.3d 1131, 1149 (10th Cir. 2009). Bahrani's only assertion of prejudice is that, "[b]y allowing the affidavit, the [district] court insulated Mr. Schmeh from cross-examination where he would have been forced to admit: it was obvious (to him) no changes were allowed without permission; the veterinarian *could* have denied permission; and withholding permission would have required a replacement certificate and payment of a fee." Aplt. Br. at 63 (italics in original). But Bahrani's counsel was able to argue these points to the jury at the hide export certificates trial, notwithstanding the fact that Schmeh did not appear as a witness.[12] Moreover, as noted by defendants, Schmeh's description of how he handled certificate changes was echoed by several other witnesses without objection from Bahrani. Thus, we conclude the district court's error was harmless.

---

[12] We note that Schmeh's affidavit was specifically cited by this court in Bahrani I in support of the conclusion that "major" or "significant" changes warranted new certificates. 465 F.3d at 1193.

46

*B. Appeal No. 09-1180 (Defendants' cross-appeal)*

Defendants assert three issues in their cross-appeal, all of which focus on the hide export certificates portion of the remand proceedings. First, defendants contend the district court erred in entering judgment against them in light of the fact that the jury at the hide export certificates trial found, in response to a special interrogatory on the verdict form, that no hide export certificates were changed by defendants' employees for the purpose of avoiding an obligation to the government. Second, defendants contend that the fines and penalties assessed against them at the hide export certificates trial violate the Eighth Amendment and the Due Process Clause. Third, defendants contend the district court erred in failing to exclude evidence of certificates that were changed by defendants after the period of Bahrani's employment with ConAgra. As outlined in greater detail below, we agree with defendants that the jury's findings at the hide export certificates trial entitled them to judgment as a matter of law on Bahrani's hide export certificates claims. Consequently, it is unnecessary for us to address the remaining two issues asserted by defendants in their cross-appeal.

1) *Allison Engine - the applicable scienter requirement*

Defendants first raised the issue of the proper scienter requirement in a post-Bahrani I, pretrial motion for summary judgment based upon the Supreme Court's June 9, 2008 decision in Allison Engine Co. v. United States, 553 U.S. 662 (2008). The district court summarily denied the motion "with the admonition

47

that the issue raised w[ould] need to be addressed in the context of drafting

appropriate jury instructions." Dist. Ct. Doc. 337 at 1. The district court

subsequently issued a pretrial order entitled "ORDER RE SCIENTER

STANDARD," Aplee. Supp. App. at 353, that concluded as follows:

> To summarize, the scienter requirement will be articulated as the act of making a major or significant change (or correction) to a hide export certificate without getting a replacement when the actor either (1) knew at the time he discovered a change was necessary that the change required getting a replacement certificate; (2) knew major or significant changes required replacement certificates but was deliberately ignorant of whether the particular change made fell into that category; or (3) knew major or significant changes required replacement certificates but acted in reckless disregard of whether the change fell into that category. I apply this standard out of an abundance of caution and am aware that Allison Engine may support the imposition of a higher (specific intent) level of scienter for reverse false claims under the Act. However, it will be for the Tenth Circuit to hold Mr. Bahrani to this higher standard, not me.

Id. at 358-59.

At trial, defendants moved for judgment as a matter of law pursuant to

Federal Rule of Civil Procedure 50 based upon Allison Engine. Aplt. App. at

2213-14 ("Your Honor, our motion relates to the evidence relating to whether the

ConAgra employees making the changes had any purpose or intent to avoid a fee

for replacement certificates. * * * [I]t is absolutely clear that there is no

evidence to support any finding that the ConAgra employees acted with any

purpose, [or] intent to avoid a fee for replacement certificates."). Consistent with

its pretrial rulings, the district court denied those motions, but included on the

48

verdict form a special interrogatory that asked the jury, "How many of the hide export certificates containing major or significant changes, for which no replacement certificate was obtained, do you find by a preponderance of the evidence were changed with the intent or purpose of 'concealing, avoid or decreasing' the obligation to secure and pay for a replacement certificate?" Aplt. App. at 2420. At the conclusion of all the evidence, the jury found that only five out of the thousand-plus certificates at issue contained "major" or "significant" changes. The jury also found that none of these five certificates were changed with the intent or purpose of concealing, avoiding, or decreasing the obligation to secure and pay for a replacement certificate.

On March 19, 2009, the district court issued an "AMENDED ORDER FOR JUDGMENT" that stated, in pertinent part:

> The first phase of the bifurcated trial in this reverse-false claim *qui tam* action commenced on April 28, 2008 and resulted in a jury verdict finding Relator Ali Bahrani was not the original source of his meat export certificate claims. The second phase of the trial, which was then limited to Relator's reverse-false claims related to hide export certificates, was tried to a jury of 12 commencing Monday, March 9, 2009. After less than a day of deliberations yesterday, the jury returned a verdict finding that, of the 1000+ certificates proffered by the Relator as reverse false claims under 31 U.S.C. § 3729(a)(7), five had been changed in a "major" or "significant" way, and all five had been changed under circumstances where the employee who made the changes did so "knowing" that rather than making the changes directly to the certificate, he or she was required to secure a replacement certificate at a cost of $21.50 payable to the United States Government. Because actionable *scienter* in this case was framed in terms of "knowledge," rather than intent, these findings support the entry of judgment in favor of Relator and against

49

Defendants on five of Relator's reverse false claims under 31 U.S.C. § 3729(a)(7), and in favor of Defendants and against Relator on Relator's remaining 995+ reverse false claims.

Id. at 2422-23 (citation omitted).  In a footnote that accompanied this paragraph, the district court also stated:

> I note that the jury, in an advisory capacity in the event the Tenth Circuit adopts the Supreme Court's Allison Engine intent or purpose to defraud standard for scienter on appeal, also found that the employee actions in changing the five certificates at issue in a "major" or "significant" way were not made with the intent or purpose of concealing, avoiding or decreasing any obligation to secure and pay for replacement certificates.

Id. at 2423 n. 1 (citation omitted).

In their cross-appeal, defendants now challenge the district court's denial of their Rule 50 motions.  We review such rulings de novo.  Burrell v. Armijo, 603 F.3d 825, 832 (10th Cir. 2010) ("We review de novo the district court's decision on a Rule 50(b) motion for judgment as a matter of law.").

In Allison Engine, the Supreme Court "granted review . . . to decide what a plaintiff asserting a claim under" two specific provisions of the FCA, i.e., 31 U.S.C. §§ 3729(a)(2) and (3),[13] "must show regarding the relationship between the making of a 'false record or statement' and the payment or approval of 'a false or fraudulent claim . . . by the Government.'" 553 U.S. at 665 (quoting §

---

[13] Section 3729(a)(2) imposes liability on "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ."  Section 3729(a)(3) imposes liability on "[a]ny person who . . . conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . ."

3729(a)(2)).  Turning first to § 3729(a)(2), the Court held that "a plaintiff asserting a . . . claim [thereunder] must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim."  Id.  In reaching this conclusion, the Court emphasized that "the intent requirement [it] discern[ed] in § 3729(a)(2) derive[d] not from the term 'knowingly,' but rather from the infinitive phrase 'to get.'"  Id. at 671 n.2.  Relatedly, the Court also emphasized that while § 3729(b)'s definition of "knowing" and "knowingly" "refers to specific intent with regard to the truth or falsity of the 'information,'" its "holding refer[red] to a defendant's purpose in making or using a false record or statement."  Id.  Moving on to § 3729(a)(3), the Court held, in similar fashion, that "a plaintiff asserting a claim [there]under . . . must show that the conspirators agreed to make use of the false record or statement" in order to get the government to pay or approve a false claim.  Id. at 665.  In other words, the Court held, "it must be established that the[] [conspirators] agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim."  Id. at 673.

Defendants argue that "although Allison Engine involved claims brought under §§ 3729(a)(2) and (a)(3), the holding is equally applicable to claims brought under § 3729(a)(7)," i.e., the FCA's reverse false claims subsection that defendants purportedly violated when they made "major" or "significant" changes

51

to hide certificates.  Aplee. Br. at 67.  More specifically, defendants assert that "[t]he language of (a)(7) is the mirror of (a)(2)" because "[s]ection (a)(2) prohibits using a false statement 'to get' paid, and section (a)(7) prohibits using a false statement 'to avoid' paying."  Id.  "Just as the term 'to get' denotes purpose," defendants argue, "so does the term 'to avoid.'"  Id.  In short, they argue, "[t]here is no principled way to impute an intent requirement onto (a)(2) claims without doing the same for (a)(7) claims."  Id.

We agree.  Section 3729(a)(7) imposes liability on "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).[14]  As the Ninth Circuit has noted, "[t]he plain language of this statute requires that a defendant make or use a false record or statement in order to conceal, avoid or decrease an obligation to pay the government."  United States v. Bourseau, 531 F.3d 1159, 1169 (9th Cir. 2008).  And, as defendants suggest and the government agrees in its amicus brief,

---

[14] Congress substantially revised § 3729, and effectively overruled Allison Engine, on May 20, 2009 by enacting the Fraud Enforcement and Recovery Act of 2009.  Subsection (a)(7) was amended to become subsection (a)(1)(G) and now reads as follows: "Subject to paragraph (2), any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty . . . ."  31 U.S.C. § 3729(a)(1)(G).  This newly revised subsection was not made retroactive by Congress and is thus inapplicable to this case.

52

subsection (a)(7)'s use of the phrase "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" is effectively indistinguishable from subsection (a)(2)'s operative phrase "to get a false or fraudulent claim paid or approved by the Government." In other words, as the Supreme Court indicated in <u>Allison Engine</u>, both phrases incorporate an intent requirement. <u>See</u> Gov't Br. at 10 ("the same connotation of purpose that the Supreme Court found in the infinitive phrase 'to get' in § 3729(a)(2) is present in the corresponding phrase 'to conceal, avoid, or decrease' in § 3729(a)(7)."). In the case of subsection (a)(7), this means that a plaintiff attempting to prove liability thereunder must establish that the defendant "made a false record or statement for the purpose of" concealing, avoiding, or decreasing an obligation to pay or transmit money or property to the Government. <u>Allison Engine</u>, 553 U.S. at 671.

In turn, it is clear, given the jury's findings in response to the special interrogatory at the hide export certificates trial, that the judgment entered in favor of Bahrani and against defendants as it relates to the hide export certificate claims must be reversed and the case remanded to the district court. The only question is whether, as suggested by defendants, the district court should be instructed to enter judgment in favor of defendants on all the hide certificate claims, or whether, as urged by the government, the five viable hide export certificate claims must be retried. In its amicus brief, the government argues, in

53

somewhat confusing fashion, that the FCA's reverse false claims provision, § 3729(a)(7), "must cover those cases where a defendant employs a statement for the purpose of avoiding an obligation to pay — whether or not he has actual knowledge of the existence or scope of the obligation." Gov't. Br. at 15. "Otherwise," the government argues, "the word 'knowingly' in § 3729(a)(7) would cease doing any independent work." Id. Here, the government argues, "[t]he jury's advisory verdict is ambiguous, and leaves open the possibility that ConAgra lacked the requisite intent [to defraud] only because it remained recklessly ignorant of whether it owed the obligation." Id. at 19. "The jury should instead have been instructed," the government argues, "to determine whether Con[A]gra acted with the purpose of diminishing the amount it paid to the government, whether or not it had actual knowledge that it should have secured the five replacement certificates." Id. Thus, the government asserts, the case must be remanded to the district court for further trial proceedings on those five certificates.

We reject the government's position. As we see it, the government's position improperly conflates § 3729(b)'s "knowingly" standard and § 3729(a)(7)'s intent requirement. In Allison Engine, the Supreme Court emphasized that "the intent requirement . . . derives not from the term 'knowingly,' but rather from the infinitive phrase ['to conceal, avoid, or decrease' in § 3729(a)(7)]." 553 U.S. at 671 n.2. In other words, Allison Engine

54

effectively rejected the notion that the intent requirement incorporates § 3729(a)(7)'s "knowingly" standard. And with good reason. As defendants aptly note, "[i]f every defendant who knows or should know about an obligation to pay money is automatically deemed to have acted with the purpose of decreasing the obligation, there is no purpose or intent standard left," Aplee. Reply Br. at 10-11, and we would be left with something akin to "a strict liability standard," id. at 10.

Thus, in sum, we conclude the district court's judgment pertaining to the hide export certificates trial must be reversed and the case remanded to the district court with directions to enter judgment in favor of defendants on Bahrani's hide export certificate claims.

### C. Appeal No. 09-1388 (Bahrani's appeal of the fee award)

In a separate appeal (No. 09-1388), Bahrani challenges on several grounds the district court's ruling on his motion for fees, expenses and costs. These challenges, however, have been rendered moot by our ruling on defendants' cross-appeal. More specifically, because we find it necessary to reverse the district court's pertaining to the hide export certificates trial, the district court's award of expenses, fees and costs in favor of Bahrani must necessarily also be reversed.

### III

The district court's judgment pertaining to Bahrani's meat export certificate claims is AFFIRMED. The district court's judgment pertaining to Bahrani's hide export certificate claims is REVERSED and the case REMANDED to the district

55

court with directions to enter judgment in favor of defendants on the hide export certificate claims.  The district court's award of fees, expenses and costs in favor of Bahrani is REVERSED, and Bahrani's fee-related appeal (No. 09-1388) is DISMISSED as moot.